**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STEPHEN GRINVALSKY, : | |
|     Plaintiff, : | |
| : | |
| v. : | 3:23-CV-797 (OAW) |
| : | |
| MAXINE CARTWRIGHT, et al., : | |
|     Defendants. : | |

## **INITIAL REVIEW ORDER**

The self-represented plaintiff, Stephen Grinvalsky, was a sentenced prisoner in the custody of the Connecticut Department of Correction ("DOC") for all times relevant to this complaint. He brings claims under 42 U.S.C. § 1983 for damages based on alleged constitutional violations concerning his mental health treatment at DOC prison facilities. *See generally* ECF No. 29.[1] He names 22 defendants,[2] each of whom he sues in their individual capacity.

The Prison Litigation Reform Act requires that federal courts review complaints brought by prisoners seeking relief against a governmental entity or against an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). Upon review, the court must dismiss any complaint (or any portion thereof) which is frivolous or malicious, which fails

---

[1] Plaintiff filed several documents that appeared to be supplements to or revised versions of his original complaint. *See* ECF Nos. 18, 22, 26. He ultimately filed one complete pleading on December 6, 2024, which is docketed at ECF No. 29. That is the operative complaint that is the subject of this review.
[2] The court includes in this number all those individuals listed in the case caption of the amended complaint and all those listed as parties in the body of the complaint: DOC Commissioner Angel Quiros, Warden Craig Washington, Captain George Hurdle, Correctional Officer Andy Medina, Social Worker Gail Wiggins, Social Worker Jane Doe, Social Worker Cummings, Social Worker Demers, Social Worker Pasquale Cusano, Social Worker Susan Rynkiewicz, Social Worker Thibideau, Social Worker Echevarria, Psychiatrist John Creegan, Psychiatrist Kathryn Carhart, Psychiatrist Jean Gauvin, Psychiatrist Craig Burns, APRN Jacklyn Murrillo, APRN Zoey Walker, APRN Patricia Baginski, Psychiatrist Karen Brody, Psychiatrist Maxine Cartwright, and APRN Sarra Torre.

1

to state a claim upon which relief may be granted, or which seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b). Accordingly, the court has reviewed all factual allegations in the operative complaint and has conducted an initial review of the allegations therein.

## I. **FACTUAL BACKGROUND**[3]

Plaintiff's principal grievance is that DOC mental health providers diagnosed him with and treated him for psychiatric disorders he alleges he does not have. He claims that they falsified his medical records, wrongfully placed him on suicide watch (the conditions of which were inhumane and unhygienic), and forced him to take medications that caused him cognitive delays. Ultimately, his diagnosis caused him to be transferred to a higher-security prison and then to a higher-security cellblock, where he was assaulted by another prisoner.

Somewhat tangential to his principal claim, Plaintiff also asserts that he suffered retaliation for filing grievances related to his diagnosis. He claims his grievances were disregarded and that he was housed, as an unsentenced inmate, with sentenced inmates who had documented histories of requiring single cell status due to "not being able to function with cellmates." ECF No. 29 ¶ 43.

Finally, Plaintiff also claims that he was placed in too-tight handcuffs on one occasion and shackled on another.

---

[3] The court does not exhaustively relate the factual allegations in the operative complaint, but merely summarizes them here for context. All allegations in the operative complaint are deemed true for the purpose of initial review.

## II. **DISCUSSION**

The court construes the operative complaint to state the following § 1983 claims:[4] unconstitutional conditions of confinement under the Fourteenth Amendment; violation of Plaintiff's right to bodily integrity under the Fourteenth Amendment; and retaliation in violation of the First Amendment.  Section 1983 "provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999).  "The common elements to all § 1983 claims are: '(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Lee v. City of Troy*, 520 F. Supp. 3d 191, 205 (N.D.N.Y. 2021) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).

### A. **Defendant Quiros**

As a preliminary matter, the court must immediately dismiss Defendant Quiros from this action.  A plaintiff seeking monetary damages from a defendant must allege facts that establish the personal involvement of that defendant in the alleged constitutional violation.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).  This is also true for supervisory officials.  *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020) ("To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the

---

[4] Plaintiff also asserts state law claims, which the court will not review here.  If any federal law claims survive initial review, then the validity of any state law claims may be addressed in the usual course by way of a motion to dismiss or a motion for summary judgment.

underlying constitutional violation directly against the official without relying on a special test for supervisory liability."). But the amended complaint alleges no conduct by Defendant Quiros. Accordingly, Defendant Quiros is dismissed from this action entirely.

### B. Psychiatric Diagnosis

Though Plaintiff also complains of several consequences of his mental health diagnosis (falsification of his records, being forced to take medications, being placed on suicide watch, and his transfers to higher-security housing), the chief issue he presents in the operative complaint clearly is the diagnosis itself. But it is well-settled that a diagnosis cannot, by itself, be the basis for a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (finding that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment . . . ."); *see also Sires v. Berman,* 834 F.2d 9, 13 (1st Cir. 1987) ("We do not sit as a medical board of review. Where the dispute concerns not the absence of help but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors."). Even if the diagnosis was wrong, that would not be actionable under § 1983. *Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *see also* Johnson v. Wright, 234 F. Supp. 2d 352, 365 (S.D.N.Y. 2002) (holding that an error in diagnosis does not show a constitutional violation); *Tindal v. Goord*, 340 F. App'x 12 (2d Cir. 2009) (finding no constitutional violation where an inmate allegedly was misdiagnosed with various infections).

For a diagnosis or a course of treatment to be actionable under § 1983, a plaintiff must show that it was the result of something other than medical judgment. *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *see also Braham v. Perelmuter*, 2017 WL 3222532, at *17 (D. Conn. July 28, 2017) (denying summary judgment due to a genuine dispute over whether certain dental treatment "derived from sound medical judgment."). The only allegations in the complaint that might be intended to show improper motives relate to Defendant Wiggins, who Plaintiff alleges had prior knowledge of him due to a previous professional affiliation with Mental Health Connecticut. Plaintiff contends that Defendant Wiggins had access to information about him there (presumably because he was a patient there); and that she had "relations" with another employee there who was a victim in a 2019 case brought against Plaintiff. ECF No. 29 ¶ 25. But the former reflects only Plaintiff's suppositions about what Defendant Wiggins saw or heard in the course of her employment years ago "due to being able to read reports and conversate with other [M]ental [H]ealth Connecticut employees," *Id.* ¶ 24, and the latter is only a vague acknowledgment of a previous working relationship with someone connected to Plaintiff. Neither Plaintiff's speculation nor so tenuous a connection is sufficient to show any impropriety in Plaintiff's diagnosis.[5] Absent any factual allegation to support the assertion that the diagnosis itself was the result of some ulterior motive, the diagnosis itself and all that flowed from it (the records, the suicide watch, the medications, and the housing transfers) cannot support any constitutional claim.[6]

---

[5] The court also notes that Defendant Wiggins only began treating Plaintiff in 2022, ECF No. 29 ¶¶ 24–25, but Plaintiff alleges that he has been misdiagnosed and maltreated for 13 years, *id.* ¶ 28, so these assertions are of limited relevance to begin with.

[6] Plaintiff's state law defamation claim also flows from his diagnosis, and so this claim also is dismissed.

5

Relatedly, the court cannot find that the assault Plaintiff suffered while in higher-security housing provides any basis for a constitutional claim. Plaintiff alleges that his assault would not have occurred had he been in a "normal functioning prison." *Id.* ¶ 66. But it also appears that his transfers were the result of his own mental health diagnosis. *See id.* ¶ 31. As discussed supra, Plaintiff has not alleged sufficient facts to show any impropriety in the diagnosis, and consequently the court cannot find any impropriety in the transfers, either. And while Plaintiff alleges that Defendants Washington and Hurdle "knew the violence of the inmate they released early from administrative segregation," *id.* ¶ 44, that is not enough to hold them responsible for the assault.[7] Thus, any claim related to the assault also cannot proceed.

### C. Bodily Integrity

The forced administration of medication presents a related but distinct issue. It is well-settled that an individual has a constitutional right to bodily integrity, but it also is well-settled that a prison may force involuntary medications upon an inmate where certain procedural safeguards are met. The Supreme Court of the United States has held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington v. Harper*, 494 U.S. 210, 227 (1990). Importantly, these determinations need not be made by a judge. *Id.* at 231 (concluding that "an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical

---

[7] Plaintiff has not brought any claims against the officers who allegedly prolonged the assault by being slow to respond to it. ECF No. 29 ¶ 42.

professionals rather than a judge."). Therefore, the court's role here merely is to review whether adequate procedure existed "to ensure [Plaintiff's] interests [we]re taken into account." *Id.* at 233. In *Harper*, the Supreme Court found procedural safeguards to be adequate where the inmate received "notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses." *Id.* at 235.

Here, though, there is little information provided about what process Plaintiff received. There is one passing reference to one of the defendants requesting that "another involuntary medication hearing be held," and Plaintiff states that he appealed the decision of "the involuntary medication panel . . . ." ECF No. 29 ¶¶ 40, 46. It is clear, then, that Plaintiff received some process, but the court cannot permit this claim to proceed without clearer allegations about the specifics of that process.

### D. Retaliation

Plaintiff also alleges that he suffered retaliation due to his repeated grievances regarding his diagnosis. He asserts that the defendants disregarded those grievances and housed him with sentenced inmates when he still was unsentenced. *Id.* ¶ 43.

The elements of a First Amendment retaliation claim are "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)) (internal quotation marks omitted). The United States Court of Appeals for the Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually

any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir.2003)).

It is generally accepted in this circuit that "[p]rotected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance." *Baltas v. Maiga*, No. 3:20cv1177 (MPS), 2020 WL 6275224, at *8 (D. Conn. Oct. 26, 2020). Plaintiff alleges that he appealed his diagnosis on February 28, 2023, ECF No. 29 ¶ 40, and that he submitted a form CN 8904 (which the court presumes is a grievance form) on either November or December 23, 2022 (it is not clear which), *id.* ¶ 36.[8] The court therefore accepts for the purpose of this initial review that Plaintiff has met the first requirement of a retaliation claim.

As to the second element, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001)) (internal quotation marks omitted). While some judges have found that refusing to address grievances may be a basis for a First Amendment retaliation claim, *see, e.g., Harnett v. Barr*, 538 F. Supp. 2d 511, 522–23 (N.D.N.Y. 2008) (permitting a First Amendment retaliation claim to proceed upon allegations that a prison official stopped responding to an inmate's grievances), Plaintiff's

---

[8] Plaintiff also alleges that he made an oral request to Defendant Cummings for a transfer to a lower-security cellblock, ECF No. 29 ¶ 42, but a housing request is not protected activity, and so this allegation will not be discussed here.

allegations only show that a single grievance went unanswered.  *Id.* ¶ 36.  Even counting his appeal, which was returned because it was improperly submitted, *id.* ¶ 40, that would leave only two unanswered grievances.  This is too de minimus an injury to sustain a constitutional claim.  But the court will accept that an inmate of ordinary firmness might forego advocating for themselves to avoid unpleasantness and threats in housing, and therefore, the court will assume for the purpose of initial review that his housing assignments satisfy the second element of the retaliation claim.

However, there are insufficient facts establishing a causal connection.  There are no allegations of any conduct from which one might infer a retaliatory motive with respect to the two grievances filed by Plaintiff.  *Cf. Harnett*, 538 F. Supp. at 522 (noting that the inmate and a prison official had an argument before the alleged retaliatory act).  And it is unclear how often, how long, or even when Plaintiff was housed with any unsentenced inmates, particularly in relation to when he filed his grievances.  The court therefore cannot permit Plaintiff's retaliation claim to proceed, either.

### E. Excessive Force

The appropriate standard for an excessive force claim depends on whether or not the inmate was sentenced at the time of the use of force.  It is not clear when the allegedly forceful acts occurred in relation to Plaintiff's sentencing, and so the court will err on the side of caution and evaluate them under the more permissive standard of the Fourteenth Amendment.  To prevail on such a claim, a pretrial detainee must show "the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  This standard is not to be applied

mechanically, though.  *Id.*   Courts must determine the objective reasonableness of force used within the context of "the facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotation marks omitted). Those facts and circumstances necessarily include the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," and appropriate deference to "policies and practices that . . . are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)) (internal quotation marks omitted).

There are several allegations which Plaintiff may have intended to use as the predicate conduct for an excessive force claim: his being shackled,[9] his handcuffs being put on too tight, and the corrections officer pointing her gun at him.  But none of these vague allegations, individually or in the aggregate, rise to the requisite level of objectively unreasonable conduct.  Plaintiff states that he was shackled by transport officers prior to his transfer to a new facility, which circumstances the court finds justifies heightened security measures even if Plaintiff was not violent.  And without additional detail, the court cannot find that either a single instance of tight handcuffs or a single instance of being held under cover of a firearm constitute an objectively unreasonable action, particularly where these actions occurred while transporting Plaintiff outside the controlled setting of a prison to a public health facility.  ECF No. 29 at 44–45.  The court therefore also must dismiss any excessive force claim.

---

[9] Plaintiff alleges that he was shackled just prior to being medicated involuntarily, but as the court already has determined that Plaintiff's involuntary treatment is not actionable on these asserted facts, the court need not address that allegation here.

10

### F. Conditions of Confinement

There is one claim, though, that the court finds to be supported adequately enough to survive initial review: a deliberate indifference claim predicated upon the alleged squalor in which Plaintiff was held while on suicide watch. Plaintiff asserts that during that period, he was left barefoot and naked in a cell that had feces on the floor and the walls and that smelled like urine.[10] *Id.* 29 ¶ 29. He also alleges that he was prevented from showering or brushing his teeth for over 14 days. *Id.* ¶ 34.

It appears that Plaintiff was placed on suicide watch in September 2022, *id.*, and the court takes judicial notice of publicly-available information indicating that the relevant sentencing occurred on May 9, 2023,[11] meaning Plaintiff was a pretrial detainee when he was on suicide watch. Accordingly, the court will analyze this claim under the Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2nd Cir. 2017) (stating that claims pertaining to the conditions of a pretrial detainee's confinement in a state prison facility should be evaluated under the Fourteenth Amendment's Due Process Clause because a pretrial detainee has not been convicted of any crime and thus "may not be punished in any manner—neither cruelly and unusually nor otherwise.") (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)) (internal quotation marks omitted).

A claim that a prison official has acted with deliberate indifference under the Fourteenth Amendment requires a showing of two elements: (1) that the plaintiff was

---

[10] Plaintiff also alleges that certain officers permitted another inmate to steal Plaintiff's shoes, ECF No. 29 ¶ 29, but these officers are not identified or even named as "Doe" defendants, and so the court cannot let any claim predicated upon the alleged theft proceed past initial review.

[11] *See* "State of Connecticut Judicial Branch: Criminal Motor Vehicle Conviction Case Detail, Case No. F02B-CR22-0244724-T," available at jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key =d03fd3ca-9d87-4867-ae81-581a426d60a9 (last visited Sept. 24, 2025).

subjected to an objectively serious condition; and (2) that the defendant acted "with at least deliberate indifference to the challenged conditions." *Id.* With respect to the objective prong, the plaintiff must show that the conditions he experienced "pose[d] an unreasonable risk of serious damage to his health," which may include risk to the plaintiff's mental health. *Id.* at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)) (internal quotation marks omitted). Deliberate indifference can be established under either a subjective or an objective standard, meaning Plaintiff must show that the defendant was reckless in his failure to take reasonable care to mitigate the risk posed by the challenged condition even though the defendant-official knew, *or should have known,* the risk posed by that condition. *Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2d Cir. 2019). In other words, a detainee "must prove that an official acted intentionally or recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36.

The court finds that Plaintiff has satisfied each element. "[T]he proper lens through which to analyze allegedly unconstitutional unsanitary conditions of confinement is with reference to their severity and duration, not the detainee's resulting injury." *Darnell*, 849 F.3d at 30. The court finds that two weeks of living in human filth without the means to tend to the basics of personal hygiene is sufficient to show a serious risk to Plaintiff's physical and mental health. Further, it appears that Defendants Cartwright and Torre had actual knowledge of those conditions, as Plaintiff alleges it was their reports that kept him there and that they both saw him while he was on suicide watch. ECF No. 29 ¶¶ 25, 29, 34. And while Plaintiff does not allege that Defendant Washington had anything to do with placing him on suicide watch, the court finds it reasonable to infer that

as the warden, Defendant Washington ought to have known the conditions in which the persons in his care were being kept. Accordingly, the court will allow this deliberate indifference claim to proceed against these three defendants.

### G. <u>Appointed Counsel</u>

Finally, the court notes that Plaintiff has asked for appointed counsel. *See* ECF No. 33. The Second Circuit has cautioned district courts against the "routine appointment of counsel . . . ." *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 173-74 (2d Cir. 1989). Thus, in considering whether to appoint pro bono counsel for an indigent litigant, the court must "first determine whether the indigent's position seems likely to be of substance." *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986); *see also Cooper*, 877 F.2d at 171 ("[C]ounsel is often unwarranted where the [litigant's] chances of success are extremely slim."). If the claims are sufficiently meritorious, the court should then consider other factors bearing on the need for appointment of counsel, including the movant's ability to investigate the factual issues of the case, whether conflicting evidence implicating the need for cross-examination will be the major proof presented, the movant's apparent ability to present the case, and the complexity of the legal issues involved. *See Hodge*, 802 F.2d at 61–62. At this early state of litigation, it is not clear that the plaintiff's claims are of sufficient merit to warrant an appointment of counsel, particularly given the conclusions herein. Thus, the court must deny the plaintiff's motion, but without prejudice to filing another motion for appointment of counsel at a later time.

13

## III.    ORDERS

For the foregoing reasons, the court enters the following orders:

(1) Plaintiff may proceed on the following claims:

  a. A Fourteenth Amendment Due Process claim against Defendants Cartwright, Torre, and Washington for the unsanitary conditions in which he was held while on suicide watch; and

  b. State law claims of intentional and negligent infliction of emotional distress predicated upon the same unsanitary conditions.

(2) All other claims are dismissed without prejudice.

(3) The Clerk of Court is asked to please terminate all defendants from this action except Defendants Cartwright, Torre, and Washington.

(4) Given the conclusions herein, Plaintiff's Motion to Serve Amended Complaint to Defendants and Issue Restraining Order, ECF No. 31; and his Motion for Permanent Injunction, ECF No. 32 (both of which seek relief from his diagnosis) are denied as moot.

(5) Plaintiff's Motion to Appoint Counsel, ECF No. 33, is denied without prejudice.

(6) Plaintiff hereby is granted **one final opportunity** to amend the complaint, which amendment must be filed on or before **December 1, 2025. An amended complaint, if filed, will completely replace the complaint, and the court will not consider any allegations made in the original complaint in evaluating any amended complaint.** The court will review any amended complaint to determine whether it may proceed to service of process.

(7) If Plaintiff wishes to proceed only on those claims noted above, he may file a notice on the docket stating as much, at which point the case will proceed immediately to service. If nothing is filed on the docket by **December 1, 2025,** the court will assume that Plaintiff wishes to proceed only on these claims.

(8) If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(d) provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address.

**IT IS SO ORDERED** at Hartford, Connecticut, this 24th day of September, 2025.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE